UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN W. BABLER, et al., | ) | CASE NO. 1:08cv912 |
| Plaintiffs, | ) ) | JUDGE JOHN R. ADAMS |
| vs. | ) ) ) | |
| MALCOLM B. FUTHEY, Jr., et al., | ) ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendants. | ) ) | [Resolving Doc. 137] |

This matter is before the Court upon the Motion of Plaintiffs for a Temporary Restraining Order and/or a Preliminary Injunction ("Motion"). (Doc. 137). The Court heard oral argument on the Motion on August 5, 2009. The Court has been advised, having reviewed the parties' briefs and having heard oral argument from all parties. For the reasons set forth herein, Plaintiffs' Motion, which the Court has treated as a motion for preliminary injunction, is GRANTED.

I. **Factual Background**

This motion for injunctive relief is the second such motion Plaintiffs have filed. The first was filed in an effort to prevent the United Transportation Union ("UTU") Executive Board from conducting an internal union trial on charges brought by individual union members against Plaintiffs, who were International Vice Presidents of the UTU and had supported an effort to merge the UTU with the Sheet Metal Workers International Association ("SMWIA"). In their first motion for injunctive relief, Plaintiffs argued that the charges resulted from their participation as intervenors in the merger litigation in this Court, namely *Michael v. Thompson*, 1:07cv3818 ("*Michael*").[1] They alleged that this retaliatory prosecution of charges would operate to chill free speech and prevent union members' free participation in litigation, and that therefore a trial on the charges would violate the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401, *et seq*.

Originally, this case involved seven plaintiffs, two of whom are no longer involved in the litigation. Plaintiffs John W. Babler, Victor Baffoni, Roy G. Boling, James R. Cumby, John D. Fitzgerald, and Costantino A. Iannone were International Vice Presidents and members of the UTU's International Board of Directors. Plaintiff James. M. Brunkenhoefer was the National Legislative Director of the UTU and also served on the International Board of Directors. Mr. Brunkenhoefer passed away during the pendency of this litigation and is no longer a party to any of these claims. Mr. Boling and Mr. Fitzgerald resigned their offices prior to the commencement

---

[1] The merger litigation resulted in this Court's granting a preliminary injunction to prevent the consummation of the merger, a ruling that was appealed by the intervenors in that matter (Plaintiffs in this matter) to the Sixth Circuit Court of Appeals. On October 23, 2009, the Sixth Circuit issued an opinion the result of which appears to require dismissal of the *Michael* litigation, though there were three separate opinions from the panel. The UTU and Futhey have petitioned the Sixth Circuit for rehearing or rehearing *en banc*, and the court has not yet ruled on the petition.

2

of the internal trial, and Mr. Boling was dismissed as a plaintiff by agreement of the parties. Mr. Fitzgerald remains a plaintiff, but did not undergo the internal trial and does not seek injunctive relief. *See* Doc. 137-2 n. 1.

There are three groups of Defendants[2] in this litigation. First is the UTU International President Malcolm Futhey. Second is the UTU Executive Board, which is responsible for hearing and deciding any internal charges brought against members of the UTU, as well as each of the five individual members of the UTU Executive Board, namely James A. Huston, John J. Risch, Joseph A. Boda, Jr., Steven T. Dawson, and Kevin Goring. Finally, the UTU members who filed charges against Plaintiffs have been named as Defendants: John England, Larry Barrilleaux, Bonnie Morr, Red Dare, L.P. King, Jr., Elizabeth Woodbridge, and David M. Murphy.[3]

In its Memorandum of Opinion and Order (Doc. 33) in this action denying Defendants' motion to dismiss, the Court set forth the facts necessary for the decision of the motion. Those facts, which now serve as preliminary facts for the instant motion, were as follows:

> During the fall of 2007, the UTU, under the leadership of then-President Paul Thompson, attempted a merger with the Sheet Metal Workers International Association ("SMWIA"). A merger agreement was drafted and submitted to the membership for a ratification vote. The merger agreement as presented was approved by a majority of the members casting a vote.

---

[2] In oral argument on this Motion, counsel for Plaintiffs indicated that she had only sought injunctive relief against Defendant Executive Board, but all three groups of Defendants filed responses to the Motion. While that is not clearly stated in the Motion, the Court notes that the standing of Defendant Charging Parties to oppose the Motion is questionable. However, it has considered all of the briefs filed on behalf of the various Defendants. In an abundance of caution, the Court now issues this Opinion only as to Defendants Executive Board and Futhey, the Defendants whose standing to oppose the Motion is not clearly at issue.

[3] Four other charging parties, namely Delbert Strunk, James. P. Jones, Gary DeVall, and Ronald Clements, were originally named as defendants but have since been dismissed.

Just after the vote was concluded, several members of the UTU challenged the merger in the Federal District Court for the Northern District of Ohio[4] on the basis that the vote was improperly conducted and members had not been given a copy of the proposed constitution governing the merged union in violation of the terms of the merger agreement. The plaintiffs in that litigation sought injunctive relief to block the merger, which was scheduled to be consummated on January 1, 2008. The Court granted the plaintiffs' motion for a temporary restraining order, and later granted their motion for a preliminary injunction.

In January 2008, at the same time the merger was to be consummated, the leadership of the UTU underwent a transition. Paul Thompson was replaced by Futhey as President of the UTU, and several other newly elected officers replaced those who had held office up to the end of 2007. The plaintiffs in the *Michael* litigation filed a motion to substitute Futhey for Thompson on January 4, 2008, which the Court granted on January 16, 2008. While Thompson had both sought and supported the merger with the SMWIA, Futhey opposed it, and his administration chose not to defend the merger in the *Michael* litigation. Plaintiffs in the instant matter opposed that decision and sought to intervene in support of the merger. Their motion was ultimately granted. They have since filed a motion to dismiss the plaintiffs' claims in the *Michael* litigation and are continuing to defend the merger.

Plaintiffs now allege that "false internal union charges" have been filed against them by UTU members led by three of the named Defendants and Defendant UTU Executive Board. According to Plaintiffs, Roy Arnold, who is not a party to this action, filed charges against Thompson and Rick Marceau, who is also not a party to this action, on November 7, 2007. Arnold[] charged Thompson and Marceau with "intentionally conspir[ing] with other high-ranking officers to deceive the UTU Board of Directors, subordinate officers, and the membership by misrepresenting and withholding the exact terms and conditions of a proposed merger agreement between the UTU and the SMWIA." As a result, the charges read, "an illegal ballot was circulated to the membership under the appearance of a legitimate referendum vote." *Id.* Plaintiffs then cite to an email sent on the same day by Michael, lead plaintiff in the *Michael* case, referencing the charges brought and noting that those opposed to the merger should "move," and "take back [their] Union." Ultimately the charges against Thompson and Marceau were withdrawn by Arnold.

Plaintiffs next allege that Defendant Murphy, a UTU member but not an officer, sent an email on February 27, 2007, instructing the recipients (who are not identified in the Complaint) to download the attached charges against "each of the 7 officers" and giving them instructions regarding the filing of those charges. The

---

[4] The suit by the objecting members of the UTU was originally filed in the Northern District of Illinois but was shortly thereafter transferred to the Northern District of Ohio.

4

> charges referenced were allegedly those brought against Plaintiffs, and included allegations of Plaintiffs' violation of provisions in the UTU Constitution, all of which concerned Plaintiffs' participation in the *Michael* litigation and their advocacy of the merger.
>
> According to Plaintiffs, similar charges were filed against Futhey alleging that he had failed to act in the membership's best interests and had violated the UTU Constitution when he discontinued support of the merger agreement. Plaintiffs assert that Defendant Executive Board has held those charges in abeyance.
>
> Plaintiffs assert that the charges filed against them were a result of their intervention in the *Michael* litigation and as part of an attempt by Futhey and "his allies" to discourage and prevent further defense of the merger.

*Babler v. Futhey*, No. 1:08cv912, 2008 WL 3822179 at *1-2 (N.D.Ohio Aug. 12, 2008). (Doc. 33 at 1-4).

The charges brought by the Charging Parties included alleged violations of Articles 7, 16, 18, 23, 28, 41, 42, 45 and 91 of the UTU Constitution, and included a request that Plaintiffs[5] be removed from membership in the UTU. They alleged that Plaintiffs had acted as agents for another union, usurped or supplanted the authority of the UTU international president, exceeded the duties of a UTU international vice president, neglected a duty to act in the best interest of the UTU membership, resorted to civil courts prior to exhaustion of internal union remedies, violated an officer's oath of office by failing to meet obligations under the UTU Constitution, failed to remain subservient to the UTU, and forced the results of an improperly conducted merger.

On February 2, 2009, this court denied Plaintiffs' Motion for a Preliminary Injunction to enjoin the internal union trial, stressing the fact that Plaintiffs had not demonstrated a likelihood of success on the merits because the Court lacked a record that would bear out Plaintiffs'

---

[5] In referencing the Executive Board proceedings, the Court will refer to Plaintiffs as the "Charged Parties," which is how they were referred to during those proceedings. Otherwise, the Court will refer to them as Plaintiffs.

5

concerns, as the trial had not yet taken place and the Executive Board had not yet decided the charges or imposed any discipline upon Plaintiffs.  (Doc. 111 at 12-13).  The Court held that "[w]hen a record has been fully developed after the hearings are completed, the Court will be in a better position to weigh the evidence and determine the propriety of any discipline that may be imposed as a result of the hearings."  *Id.* at 12.

The Executive Board held the internal trial on February 3-5, and May 18-19, 2009.  It heard testimony from John England, one of the charging parties, in the form of a statement.  No evidence was given by Mr. England other than his prepared statement, which was a recitation of the charges against the Charged Parties.  Mr. England then underwent cross-examination by counsel for the Charged Parties.  Mr. England called Mr. Futhey, International President of the UTU, as a rebuttal witness.  Each of the Charged Parties testified on his own behalf and presented oral and documentary evidence.  They also called on their behalf Mike Sullivan, the president of the SMWIA, and several UTU members who testified to the negative effect the disciplining of the Charged Parties would have on the UTU.  Mr. England offered a closing argument; the Charged Parties filed a post-hearing brief.

During the course of the trial, there was clearly confusion regarding the scope of the constitutional provisions under which England brought the charges, and whether the charges brought existed under the UTU Constitution.  Such confusion included difficulty in identifying what provision of the constitution would define "dual unionism" and whether the constitution's expression of the president's duties would necessarily exclude particular actions on the part of other officers.  This confusion was expressed not just by the Charged Parties, but by Mr. England, Mr. Futhey and members of the Executive Board.

On July 10, 2009, the Executive Board issued its opinion finding that Charged Parties, acting as officers of the UTU, had violated the following four articles of the UTU Constitution[6]:

1. Article 16: Because Plaintiffs believed that the Board of Directors was equal to the UTU international president, they sought to usurp his authority by acting in conjunction with the SMWIA.
2. Article 18: Article requires that the International Vice Presidents perform those duties assigned to them by the International President, which the Executive board found that Plaintiffs refused to do.
3. Article 23: Article gives authority to the Board of Directors to consider and implement plans of merger, which the Executive Board found Plaintiffs to have overreached.
4. Article 28: Plaintiffs improperly resorted to opposing Futhey's policy decision rather than pursuing any appeal rights they may have had within the union first.

In its written opinion, the Executive Board stated that its decision would not strip Plaintiffs of their membership rights, nor was it intended to restrict the rights of a UTU member acting only as a member to challenge the decisions of the union. Having determined that Plaintiffs had violated the above provisions of the UTU Constitution, the Executive Board removed Plaintiffs from their offices. Shortly after this decision, the UTU Board of Directors passed a resolution ensuring that Plaintiffs would still be permitted to run for office and the Executive Board's decision would not affect their membership rights. After the Executive Board's decision was issued and before Plaintiffs' Motion was filed, the UTU filled Plaintiffs' positions by elevating those in Assistant Vice President positions, whose positions were then filled by those below them.

## II. Applicable legal standard

Rule 65 of the Federal Rules of Civil Procedure provides for a court to issue a preliminary injunction.

---

[6] The Executive Board dismissed the charges brought under Articles 7, 41, 45 and 91, and rejected those charges brought under Articles 41 and 42 that would have affected Plaintiffs' membership rights in the union.

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing[,] and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (internal citations omitted).

> When considering a motion for preliminary injunction, a district court must balance four factors:
>
> (1) whether the movant has a strong likelihood of success on the merits;
>
> (2) whether the movant would suffer irreparable injury without the injunction;
>
> (3) whether issuance of the injunction would cause substantial harm to others; and
>
> (4) whether the public interest would be served by the issuance of the injunction.

*Certified Restoration Dry Cleaning Network v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citing *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). "The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985).

A district court is not required to make specific findings concerning each of the four factors if fewer than four would be dispositive. *See In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 862 (6th Cir. 1992); *Certified*, 511 F.3d at 542 (citing *Jones*, 341 F.3d at 476). "However, 'it is generally useful for the district court to analyze all four of the preliminary injunction factors." *Certified*, 511 F.3d at 542 (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 n.3 (6th Cir. 2000)).

8

**III.     Analysis**

Plaintiffs argue not only that their removal from office is a violation of their right to free speech as recognized and protected by the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411 *et seq.*, but also that any actions taken by the UTU not immediately violative of their free speech rights are inextricably related to an initial violation, and are therefore impermissible.  Defendants contend that Plaintiffs acted with the purpose of undermining the authority of the UTU international president with respect to the SMART merger, and that removal on that basis falls within the UTU's right to enforce reasonable rules to promote union governance.

**A.  Likelihood of success on the merits**

Plaintiffs must first demonstrate a likelihood of success on the merits in order succeed on their Motion.  In their Motion, Plaintiffs contend that the LMRDA protects the speech of elected union officers, as well as their right to participate in litigation, citing *Sheet Metal Workers' Int'l Assoc. v. Lynn*, 488 U.S. 347 (1989).

> In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success.  However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation.

*Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citations omitted) (citing *In re DeLorean Motor Co.*, 755 F.2d at 1229).

**i.     Right to speech, LMRDA § 101(a)(2)**

The two provisions of the LMRDA under which Plaintiffs claim protection are §§ 101(a)(2) and (a)(4). Under § 101(a)(2):

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an

9

> election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2).

This provision was interpreted by the United States Supreme Court in *Lynn*, to which Plaintiffs point as support for their position that their speech in opposition to Futhey's was protected speech under § 101(a)(2) of the LMRDA. Defendants counter that *Lynn* does not provide blanket protection for officers of a union to oppose union policies.

In *Lynn*, an elected union officer challenged a decision made by the trustee of the union to raise dues. *Lynn*, 488 U.S. at 349-50. Ultimately, the union leadership removed him from office as punishment for his opposition. *Id.* The Court held that an elected union officer has the right to free speech under LMRDA § 101(a)(2), and that removing the officer because of his speech in opposition to the union leadership violated that right. *Id.* at 354-55. The *Lynn* Court distinguished between its holding and the Court's prior holding in *Finnegan v. Leu*, 456 U.S. 431 (1982), in which it held that the removal of an appointed officer for similar opposition to union leadership was proper:

> The consequences of the removal of an elected official are much different [from those of the removal of an appointed officer]. To begin with, when an elected official like Lynn is removed from his post, the union members are denied the representative of their choice. Indeed, Lynn's removal deprived the membership of his leadership, knowledge, and advice at a critical time for the Local . . . Furthermore, the potential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged. Not only is he fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him.

*Lynn*, 488 U.S. at 355.

While this Court previously rejected Plaintiffs' use of *Lynn* when it lacked a record of any action on the part of the UTU, it now has a complete record of the union trial and of the discipline imposed.  Upon further review, it appears that the activities undertaken by Plaintiffs do fall within the protections described in *Lynn*.  Plaintiffs spoke in opposition to the new administration's attempts to block a merger that Plaintiffs believed had been properly approved by the membership, and that they further believed was a legal obligation for the union.  *Lynn* recognized the threat to union officers who are forced to choose between their right to speak out in opposition to the proposals and policies of the union administration and their jobs as union officers:

> Given that Lynn was removed from his post as a direct result of his decision to express disagreement with [the trustee's] dues proposal . . . and that his removal presumably discouraged him from speaking out in the future, Lynn paid a price for the exercise of his membership rights.

*Lynn*, 488 U.S. at 354.  Based upon these facts, the Supreme Court concluded that the retaliatory removal of Lynn constituted a cause of action under LMRDA § 101(a)(2).

Defendants counter Plaintiffs' reliance upon *Lynn* by relying heavily upon the proviso in § 101(a)(2) that the rights of members do not prevent the union from "adopt[ing] and enforc[ing] reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."  29 U.S.C. § 411(a)(2).  Further, they argue that courts are traditionally reluctant to involve themselves in issues of internal union governance, and particularly in questions of a union's interpretation of its constitution, citing *Vestal v. Hoffa*, 451 F.2d 706, 709 (6th Cir. 1971).

The Court acknowledges this argument and expressed its reluctance to become involved in this dispute prior to the development of a record from the internal proceedings.  *See* Doc. 111

11

at 12-13.  However the Court now has before it a complete record of the internal trial.  Within that transcript, Mr. Futhey and Mr. England recited the actions of Plaintiffs in opposition to Mr. Futhey as well as the union's response to that opposition, and Defendants now seek to argue that the Executive Board's resulting actions were in accordance with the reasonable rules envisioned by the proviso to § 101(a)(2), citing *United Steelworkers of America v. Sadlowski*, 457 U.S. 102 (1982).

The *Sadlowski* Court reviewed a rule that the union enacted in order to restrict the ability of candidates for union office to accept campaign contributions from nonmembers.  *Id.* at 104.  The Court considered the question of whether the rule itself was reasonable or whether it was a violation of LMRDA § 101(a)(2), concluding that it was not a violation of the LMRDA because it was rationally related to an interest that the union sought to protect, namely the ability to control the influence of outside unions on its internal affairs.  *Id.* at 121.

This is dissimilar from the case at hand: Plaintiffs were not disciplined for violations of pre-existing union rules that were in place to promote union governance.  Instead, they were disciplined for alleged violations of constitutional provisions that the Executive Board interpreted *post hoc*.  This distinction weakens Defendants' reliance upon *Sadlowski*.

However, it also highlights the question the Court must consider after it has concluded that Plaintiffs' actions fall within the activity protected under LMRDA § 101(a)(2), namely whether the actions of the UTU satisfy the reasonableness requirement that the proviso sets forth for union rules meant to protect the union.  The Court finds that Plaintiffs have raised a serious question as to whether the union acted reasonably.

During his cross examination before the Executive Board at the start of the internal union trial, Mr. England expressed confusion about how Plaintiffs had violated the various provisions

12

of the constitution identified in the charges, and noted that he relied upon the Executive Board's interpretation of the UTU Constitution to determine those questions. *See* Doc. 137-6 at 32. For instance, he could not identify a definition of dual unionism in the UTU Constitution, though a charge of dual unionism appeared in his complaint. *Id.* He could identify nothing more than the payment of Plaintiffs' legal fees by the SMWIA as evidence that Plaintiffs' actions fell within the scope of a dual unionism charge, however such would be defined and under whichever constitutional provision it would fall. *Id.* at 33. There was similar confusion surrounding the charges of usurping the power of the president and exhausting internal remedies. *Id.* at 36-37.

The Court set forth above the four articles of the UTU Constitution Plaintiffs were found to have violated. Articles 18 and 23 give the job descriptions of both the international president and the board of directors. Plaintiffs' violation was expressed in terms of overreach of those roles, which the Court believes casts the decision of the Executive Board into nebulous territory. The job descriptions do not spell out rights and responsibilities that the Court could construe as reasonable rules.

While it is reasonable to expect that a union will need to interpret its constitution in light of novel situations, the degree to which the interpretations in this matter were unforeseen by Plaintiffs calls into question the reasonableness of the Executive Board's actions. The Court acknowledges that the *Sadlowski* decision specifically distinguishes between the scope of LMRDA § 101(a)(2) and that of the First Amendment, holding that the former is narrower than the latter. *Sadlowski*, 457 U.S. at 111-12. However, the *Sadlowski* Court further explained that this distinction does not relieve a union from applying reasonable rules in accordance with the proviso. The use of the term "rule" in reference to the provisions used to punish Plaintiffs is misleading: Plaintiffs have presented sufficient argument to raise a serious question as to

13

whether the Executive Board acted reasonably upon a defined union rule, or whether it interpreted constitutional provisions in a manner supportive of the charges against Plaintiffs. At least two of the articles in question were definitively not *rules*. They were job descriptions, the interpretation of which by Futhey or the Executive Board inferred negative duties *post hoc*.

### ii. Right to participate in litigation, LMRDA § 101(a)(4)

The second section of the LMRDA under which Plaintiffs have sought relief, § 101(a)(4), reads as follows:

> No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator: Provided, That any such member may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof: And provided further, That no interested employer or employer association shall directly or indirectly finance, encourage, or participate in, except as a party, any such action, proceeding, appearance, or petition.

29 U.S.C. § 411(a)(4).

While *Lynn* specifically addressed the rights protected by § 101(a)(2) of the LMRDA, Plaintiffs contend that the *Lynn* holding may be extended to protect their participation in the *Michael* litigation under § 101(a)(4), citing *Gilvin v. Fire*, 259 F.3d 749 (D.C. Cir. 2001). Gilvin sued the union of which he was a member and officer after it suspended him and ultimately removed him from office for actively and openly opposing union financial decisions. *Id.* at 751. He claimed that his speech was protected under LMRDA § 101(a)(2), and that his decision to participate as a witness in litigation against his union was similarly protected under LMRDA §

14

101(a)(4).  *Id.*  The court concluded that, "[a]lthough *Lynn* itself involved § 101(a)(2), there is no reason to suspect that its principles are not equally applicable to § 101(a)(4)."  *Id.* at 759-60.

Defendants distinguish *Gilvin* on the grounds that, by nature of their offices, Plaintiffs did not have discretion to disagree with the UTU president.  Further, they argue that Plaintiffs were attempting to act in their official capacity rather than as members of the UTU when they intentionally joined the *Michael* litigation, whereas Gilvin was merely subpoenaed to testify as a witness in a dispute involving his union.

These arguments are, at this stage of the litigation, unpersuasive.  Gilvin was subpoenaed to testify *against* his union because of the vociferous nature of the criticisms he had leveled publicly.  The court still found that his actions were protected under the LMRDA.  Furthermore, while Defendants have argued that Plaintiffs have no discretion to disagree with the president, the Court is not convinced that this interpretation is reasonable.  Apparently, it is based upon inferences from the definitions of the president's and vice presidents' roles in the UTU Constitution, and it hinges on Mr. Futhey's belief that no one can disagree with his decisions, a belief that would be self-serving in any instance but is particularly so here.

At the time of Plaintiffs' first motion for a preliminary injunction, Defendants argued that Plaintiffs had engaged in a "pattern of misconduct," only part of which was their participation in the *Michael* litigation.  In its order on that motion, the Court concluded that Plaintiffs had not shown otherwise, and that a lack of a record made Plaintiffs' position tenuous.  Doc. 111. Having now reviewed the record of the internal union trial, the Court finds unpersuasive Defendants' attempt to divorce or segment Plaintiffs' discipline from their participation in the *Michael* litigation, and in so doing to separate that discipline from any LMRDA-protected rights Plaintiffs have claimed.  That record does not make a clear distinction between Plaintiffs'

participation in the *Michael* litigation and their other allegedly improper activities.  Plaintiffs have presented a compelling argument that each of the instances of alleged misconduct— including ongoing communication with the SMWIA—was inextricably intertwined with Plaintiffs' decision to intervene in the *Michael* litigation to defend the merger.

As previously stated, the Court is fully aware of the traditional reluctance of courts to involve themselves in union governance, and of the deference given to unions in the reasonable interpretation of their constitutions.  However, it is also quite aware that rights protected by the LMRDA and the First Amendment are at stake, and finds that Plaintiffs have raised a serious question as to the reasonableness of the UTU's actions, presenting substantial and difficult questions that require litigation.

### B.     Irreparable harm

The second factor to be considered by a court in addressing a motion for a preliminary injunction is whether the plaintiff will suffer irreparable injury without the injunction.  *Certified*, 511 F.3d at 550.

> A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992). Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights.

*Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992); *McDonell v. Hunter*, 746 F.2d 785, 787 (8th Cir.1984)).

Defendant Futhey contends that there was no LMRDA violation, and therefore there is no issue of chill on speech within the UTU.  The Court has found that there may well have been an LMRDA violation.  Therefore this argument fails.

He next contends that, even if there were an LMRDA violation, any argument that Plaintiffs' membership rights were chilled is defeated by the fact that they were disciplined as officers, not as members. Moreover, argue Defendants, Plaintiffs' membership rights were subsequently protected when the Board of Directors passed the resolution permitting them to run for office again. Finally, Defendants contend that if the job loss were the sole source of harm, such harm is monetarily compensable and therefore does not constitute grounds for a preliminary injunction.

Defendants' argument regarding chill is hollow: even if Plaintiffs' ability to run for office were protected, this does not prevent harm to Plaintiffs' goodwill within the union. However, the Court acknowledges Defendants' contention that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90-91 (1974) (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (1958)) (internal quotation marks omitted).

But Plaintiffs' monetary loss and loss of reputation are not the only harm resulting from the Executive Board's decision: More pressing is threat of chill upon Plaintiffs and those members who elected Plaintiffs, namely that opposition to union leadership will result in swift retribution, regardless of rights reserved to members and officers under the LMRDA. *See Lynn*, 488 U.S. at 355. Following the reasoning in *Lynn*, the Court must consider not only chill as it relates to Plaintiffs, but also as it relates to the rank-in-file within the UTU, particularly at a time when the UTU is still in the throes of the merger debate. The Court finds that Plaintiffs have

17

presented a compelling argument that the rank-in-file who voted for Plaintiffs–and even those who did not–are at risk of sacrificing their LMRDA and First Amendment rights as a result of the damage done to Plaintiffs, and that Plaintiffs themselves have been chilled in their speech.

### C. Harm to others and public interest

The Court must next consider whether granting a preliminary injunction will cause substantial harm to others, including Defendants, and whether the issuance of an injunction will promote the public interest.  It does so in light of the fact that the issue presented to this Court involves Plaintiffs' First Amendment right to speech.  Because these two issues are similar, they are combined herein.

Plaintiffs could have no impact on how the UTU proceeded once the Executive Board found that Plaintiffs had committed violations.  As indicated above, the UTU almost immediately replaced Plaintiffs with lower-ranking officers, and moved still other low-ranking officers into higher positions left vacant by these adjustments.  Defendant Executive Board has argued that Plaintiffs do not seek to maintain the status quo in requesting a preliminary injunction, but instead are seeking to turn back the clock to return Plaintiffs to offices that have already been filled.  While re-adjusting the new officers holding these positions in order to return Plaintiffs to their offices until a trial on the merits could be held would undoubtedly be a hardship to Defendants, nothing compelled Defendants to act so quickly as to rearrange the hierarchy before Plaintiffs could even file their Motion.  Furthermore, Defendants argued in opposition to the first motion for a preliminary injunction that Plaintiffs were premature in seeking injunctive relief before the internal trial occurred.  Defendants will not now be heard to argue that Plaintiffs' Motion is tardy, when it was filed as soon as was practicable and

18

Defendants had already acted hastily to replace Plaintiffs in the interim.  Once again, the Court must balance hardship to Defendants against the threat to Plaintiffs' right to free speech.

Of additional concern for Defendants is the effect of an injunction on the membership of the UTU.  Defendants have repeatedly argued that the Executive Board's actions were reasonable, and that the UTU has a right to govern itself and protect its membership.  However, as noted above, in a situation involving important rights, Plaintiffs have presented a serious question regarding the reasonableness of the Executive Board's actions.  They have also raised questions about the potential chill on the speech of other members and even other officers in the union in the face of the punishment they received.  The Court, which until now has been reluctant to involve itself in the UTU's internal governance via-a-vis Plaintiffs, must err on the side of protecting Plaintiffs' rights.

The Court's final consideration relates directly to the question of substantial harm to others, and that is the issue of the effect upon the public should injunctive relief be granted.  In its opinion denying Plaintiffs' first motion for a preliminary injunction, the Court noted that Plaintiffs had not taken into account that the union members who brought charges against Plaintiffs had done so as an expression of their own speech, and that trying to short-circuit the system that would permit a trial on those charges would stifle the Charging Parties' speech.  However, the Court permitted those charges to be heard and, as it expressed, now has serious concern that the process and result were not reasonable under the language of the LMRDA.  This requires further litigation so that the issue of reasonableness may be determined, and requires that Plaintiffs be returned to their positions and that the status quo be maintained in the interim.  A risk of harm to the union or to the public pales in comparison with the risk to Plaintiffs' own rights.

**IV.     Conclusion**

For the reasons set forth herein, Plaintiffs' Motion is GRANTED. The UTU is hereby enjoined from further action with respect to Plaintiffs, and is ordered to restore the status quo ante that existed before the Executive Board issued its decision and deposed Plaintiffs, returning Plaintiffs to their offices. Furthermore, the Court waives the posting of a bond. Plaintiffs have set forth a persuasive argument in opposition to the posting of a bond (Doc. 137) to which Defendants have not offered a counter-argument in any of their briefs in opposition.

IT IS SO ORDERED.

DATE: November 18, 2009         */s/ John R. Adams*
                                Judge John R. Adams
                                UNITED STATES DISTRICT COURT